# COURT OF APPEALS OF VIRGINIA

**Record No. 1048-25-1**

RAHEEM LAMONT CHERRY

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Malveaux, Friedman and Lorish

Argued at Norfolk, Virginia

Opinion Issued July 28, 2026[*]

**FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE**
Rufus A. Banks, Jr., Judge

(Diallo K. Morris; Morris, Currin & O'Keefe, P.C., on brief), for appellant. Appellant submitting on brief.

David A. Stock, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

**MEMORANDUM OPINION BY**
**JUDGE FRANK K. FRIEDMAN**

A jury convicted Raheem Cherry of first-degree murder, concealment of a dead body, robbery, and abduction. On appeal, he argues that the evidence was insufficient to prove any of the four convictions. For the following reasons, we disagree and affirm his convictions.

BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence.  *Cady*, 300 Va. at 329.

*The Events of May 17, 2021*

This case arises from the murder of Laura Miles.  Laura was employed by a dredging company as a site safety officer in Chesapeake.  Laura's husband, Jack, was living in New York while Laura was in Virginia.  To keep in touch, the two would talk on the phone every morning before Laura left for work.

On May 17, 2021, Laura and Jack had their morning phone call as usual, but the call ended abruptly with Laura screaming.  Jack then received a text from Laura's phone number assuring him that she was okay, but the messages did not match her typical texting style.  Jack repeatedly asked Laura to call him but he received no response.

As the site safety officer, Laura was often the first employee at the dredging facility. Laura drove a Ford F150 truck.  A coworker, James Jackson, noticed that she had not shown up to work as usual on May 17, so he tried to reach her by phone.  Unable to get a hold of her, Jackson went to Laura's apartment.  Laura was not there when Jackson arrived, and he did not see any signs of disturbance.

Chesapeake Police Officer Mikayla Beasley then arrived at Laura's apartment responding to a welfare check; other officers were already at the scene.  Officer Beasley saw no signs of distress in the apartment.  When Officer Beasley returned to her car, she noticed a bag on the ground in the parking lot which was later identified as Laura's bag.[2]  Shortly after seeing the bag,

---

[2] A forensic technician who packaged and catalogued the contents of the bag noted that it contained a camera, nail polish, a phone cord, and a medical supply pack for diabetes.  Jack testified that Laura was diabetic and that she owned a "diabetic kit."

Officer Beasley located Laura's truck; it was backed into a parking space in front of another apartment building nearby.

Officer Beasley was then instructed to search for cameras in the area. She discovered a Ring doorbell camera at a nearby apartment complex. It showed a young man walking in the general area of Laura's apartment at 4:41 a.m. Investigators captured a still photo from the video and later identified the person as Raheem Cherry. A surveillance video near where Laura's truck was found depicted someone exiting the driver's side of the truck and placing items into a trash can. Laura's Buffalo Bills hardhat was later found in that trash can.

After Officer Beasley found Laura's truck, April Palmer, a crime scene technician for the Chesapeake Police Department, arrived to examine it. Palmer observed touch marks and fingerprints on the driver's and passenger's sides and the tailgate area of the truck, as well as swipe marks with "an odor of bug spray." There were several red stains inside the truck, which investigators swabbed for forensic analysis. Officers also found a can of bug spray and Laura's cell phone in the center console.

Detective William Rocca obtained location history from Laura's cell phone provider and followed it to the YMCA near her apartment building. Behind the YMCA, the officers found Laura's dead body in a ditch, covered in leaves. The officers observed blood coming from her nostrils, insect activity on her body, and that she was "stiff and cold to touch." They found a pair of glasses next to her body, which Jack later identified as belonging to Laura. Laura's wallet, which contained her driver's license, a TWIC card, $40 in cash, and six credit cards, was found in the back pocket of her pants. YMCA video surveillance confirmed that Laura's truck had entered the YMCA parking lot at 5:11 a.m. on May 17 and exited around 5:25 a.m.

While officers were canvassing the area near Laura's apartment on May 17, Detective Ron Ward noticed a man who "seemed to be very interested in what everybody was doing, but at

- 3 -

the same time, keeping his distance." After observing him for about an hour, Detective Ward and another detective approached the man, who initially refused to provide his name, address, or date of birth to the detectives. He stated that his girlfriend lived in the building and that he had just arrived and had not seen or heard anything. He subsequently provided his personal information to the detectives, identifying himself as Raheem Cherry.

*The Investigation*

Dr. Elizabeth Kinnison, the Tidewater District's Assistant Chief Medical Examiner, performed the autopsy of Laura's body. Dr. Kinnison identified 11 sharp force injuries caused by a cutting or stabbing instrument. The wounds were isolated to the left side of Laura's body. Dr. Kinnison also identified abrasions on Laura's back and bruising on her upper arms consistent with her body having been dragged. A swab from Laura's arms came back consistent with male DNA, but an exact match was indeterminable. In Dr. Kinnison's opinion, the likely cause of death was a stab wound to her neck which injured the spinal cord. Dr. Kinnison provided no opinion about a likely time of death.

After receiving evidence that led to an identification, Detective Jason Lightfoot and Detective Bobby Hatchell started looking for Cherry on May 22.[3] They met Cherry at his girlfriend's apartment, located in the same complex as Laura's apartment, and interviewed him in their unmarked police vehicle. Cherry stated that he was staying intermittently with his girlfriend, who was pregnant and due within a few weeks. Cherry initially told the detectives that his girlfriend called him around 9:00 a.m. on May 17 to tell him about the police activity. Then he told the detectives he arrived at the apartment complex between 11:00 a.m. and 12:00 p.m. after his mother dropped him off. When they began questioning Cherry, the

---

[3] It is unclear from the record what the evidence was that led the detectives to Cherry.

detectives did not know that Detective Ward had spoken to him on May 17, but Cherry told them so during their conversation. Cherry denied ever talking to Laura or touching her truck.

At that point, the detectives shared with Cherry that his fingerprints were detected on Laura's truck and that there was a photo of him from a Ring camera. Cherry ended the interview and left the vehicle. The detectives returned to the Chesapeake Police Headquarters and decided to arrest Cherry. He was taken into custody on charges of murder, robbery, and abduction.

Once in custody, Cherry spoke with the detectives again, changing his story a few times. Cherry admitted that he was the person walking around at 4:41 a.m. in the Ring camera footage and stated that he had previously touched Laura's truck when it was parked. Cherry explained that he was out early in the morning because he had an argument with his girlfriend and he went outside to listen to music. Cherry then told the officers that he had heard screaming that morning and saw a man driving a black car. The screaming stopped, he said, and he saw Laura's truck drive to the YMCA and park, and then he heard doors shutting. He watched as the truck returned, a man threw some items into a dumpster, and then the truck was parked. Cherry told the officers that he witnessed all of this from outside his girlfriend's apartment and then from the apartment's balcony.

Cherry's next iteration of his story was that he did, in fact, enter the truck out of curiosity because he thought he had witnessed a murder. He said that he opened all the doors and observed dark stains and blood in the truck, as well as Laura's cell phone. The interview was terminated after Cherry became a little agitated. The detectives then informed Cherry that he was under arrest for murder, robbery, and abduction, to which Cherry replied, "Robbery? What did I steal, her soul?" Officers later secured an additional charge for concealment of a dead body.

- 5 -

While in the booking area, Cherry asked to speak with Detective Lightfoot. The detective did not have a camera or audio recording device with him, so after Cherry started sharing a different version of events, Detective Lightfoot asked him to write down "a proper statement of the[] events." In this statement, Cherry admits to some involvement in the murder. He states that the man with the black car asked him for a "blunt wrap so he c[ould] smoke." Cherry reportedly got in the car with the man, and while they were smoking, the man showed him his Glock and his knife. The man told Cherry about his desire to rob someone's car, and the two approached Laura as she was entering her truck. Cherry returned the knife to the man, who used it to stab Laura. Cherry said that the man then pulled his Glock on Cherry and told him to get into Laura's truck. He forced Cherry to remove Laura's body from the truck and clean the interior. Cherry said he followed the man's instructions because he was scared. The man then drove off, and Cherry returned home. Cherry described the man as Black, taller than him, wearing all black and gloves, and carrying a bag. Detective Lightfoot stated that he took no action to verify Cherry's statement.

*The Trial*

At the end of the Commonwealth's case-in-chief, Cherry moved to strike the charge of concealment of a dead body. He argued that the Commonwealth did not establish the point in time at which Laura died and that without a time of death, the Commonwealth could not prove beyond a reasonable doubt that Laura was not alive when Cherry concealed her body. The Commonwealth replied that Cherry admitted to dragging Laura and dumping her body in a ditch, suggesting he believed she was dead. The court denied Cherry's motion to strike.

Cherry also moved to strike the first-degree murder charge, arguing that the Commonwealth did not sufficiently identify Laura Miles as the deceased. After hearing from the Commonwealth, the court denied the motion to strike, finding that the Commonwealth

- 6 -

established a "prima facie case with respect to this particular charge given the testimonies of Mr. Miles, the officers, the video, the autopsy, the photos, the evidence recovered from the body at the scene, which included, but was not limited to identification of Ms. Miles."

Cherry then testified in his own defense. His testimony largely mirrored his written statement, though he added that he tried to dissuade the man with the black car from hurting Laura. On cross-examination, Cherry stated that he did not know the man, but that he greeted him and "asked him if he wanted to smoke." He said that when they saw Laura get into her truck, Cherry told the man that it was "too late" and "she was already getting in the car, so it was pointless to steal the car." But he admitted that after the man stabbed Laura, Cherry helped him move the body and clean out the truck. That was why his fingerprints were on the bug spray and cell phone, he said.

He also admitted that he had the chance to escape but did not do so for fear of being shot or stabbed. And he testified that he originally lied to the detectives because "the killer told [him] not to speak about it."

Cherry then renewed his previous motions to strike; the court denied both. The jury found Cherry guilty on all four counts. The court held a sentencing hearing a little less than one year later. Cherry had previously filed a motion to set aside the verdict, and the court denied that motion at the sentencing hearing. The court sentenced Cherry to 80 years, 25 suspended for the first-degree murder charge; 15 years, 7 suspended for the robbery charge; 10 years, 7 years suspended for the abduction charge; and 3 years, 2 suspended for the concealment of a dead body charge, for a total of 67 years of active incarceration. Cherry timely appealed.

ANALYSIS

I. Cherry's First Two Assignments of Error Are Waived

Rule 5A:20(c)(2) states that "[a]n assignment of error that does not address the findings, rulings, or failures to rule on issues in the trial court or other tribunal from which an appeal is taken . . . is not sufficient. If the assignments of error are insufficient, the appeal will be dismissed." Thus, for an assignment of error to comply with Rule 5A:20(c)(2), "it must identify an erroneous ruling, finding, or failure to rule *by the trial court*." *Barnes v. Commonwealth*, 80 Va. App. 588, 595 (2024) (emphasis added).

Here, Cherry brings three assignments of error. The first two assign error not to the trial court, but to the jury. The first states that "[t]he jury had insufficient evidence to find guilt beyond a reasonable doubt" for the concealment charge, while the second states that "[t]he jury had insufficient evidence to find guilt beyond a reasonable doubt" for all four charges because the identity of the victim was not proven. These assignments of error could perhaps be read to assign error to the trial court's decisions denying Cherry's motions to strike and submitting the case to the jury. But Cherry goes on to flatly state in the argument sections corresponding to his first two assignments of error that "[t]he jury erred." In so doing, he erases any doubt about the identity of the decision-maker to whom he assigns error.

Because Cherry's first two assignments of error fail to identify an erroneous ruling, finding, or failure to rule by the trial court, they are both waived under Rule 5A:20(c)(2). *See Barnes*, 80 Va. App. at 595.

II. The Trial Court Properly Denied Cherry's Motion to Set Aside the Jury's Verdict Because the Evidence Was Sufficient to Prove Him Guilty on All Charges

A. Standard of Review

We will not set aside a trial court's judgment sustaining a jury verdict unless it is "plainly wrong or without evidence to support it." *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984)

(quoting Code § 8.01-680). "However, to the extent the appellant's assignment of error requires 'statutory interpretation, it is a question of law reviewed de novo on appeal.'" *Coomer v. Commonwealth*, 67 Va. App. 537, 545 (2017) (quoting *Grimes v. Commonwealth*, 288 Va. 314, 318 (2014)).

When reviewing the sufficiency of the evidence, the trial court's judgment "is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *Smith v. Commonwealth*, 296 Va. 450, 460 (2018). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). So we must affirm if there is any evidentiary support for the conviction. *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018).

B. First-Degree Murder

Cherry first argues that the evidence was insufficient to prove that he was guilty of first-degree murder. He contends that "there was no evidence offered to prove that the decedent's cause of death resulted from any criminal act of Cherry" and "no DNA evidence connecting the defendant to any weapon used to harm the decedent." He also claims that the Commonwealth failed to prove that he possessed the "requisite criminal intent . . . to commit the alleged crimes." And he suggests that his testimony at trial showed that he acted under duress and that he "did not aid and abet the attacker before and during the commission of the murder."

To prove first-degree murder, the Commonwealth must prove (1) that the defendant killed the victim; (2) that the killing was malicious; and (3) that the killing was willful,

deliberate, and premeditated. *Clay v. Commonwealth*, 33 Va. App. 96, 106 (2000); *see* Code § 18.2-32. Questions of malice and premeditation are usually jury questions. *See Craig v. Commonwealth*, 34 Va. App. 155, 165 (2000); *Weeks v. Commonwealth*, 248 Va. 460, 477 (1994).

"Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)). "Implied malice may be inferred from 'conduct likely to cause death or great bodily harm, wil[l]fully or purposefully undertaken.'" *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997) (quoting *Essex v. Commonwealth*, 228 Va. 273, 281 (1984)). "It necessarily follows that malice may be 'inferred from the deliberate use of a deadly weapon.'" *Tizon*, 60 Va. App. at 11 (quoting *Luck v. Commonwealth*, 32 Va. App. 827, 834 (2000)).

"To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder. The intent to kill must come into existence at some time before the killing; it need not exist for any particular length of time." *Smith v. Commonwealth*, 220 Va. 696, 700 (1980). The specific intent to kill is "something more than malice." *Epperly v. Commonwealth*, 224 Va. 214, 231 (1982).

"Premeditation and formation of an intent to kill seldom can be proved by direct evidence. A combination of circumstantial factors may be sufficient." *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989). Relevant circumstantial factors include "the brutality of an attack, whether more than one blow was struck, the disparity in size and strength between the accused and the victim, the concealment of the victim's body, and the defendant's efforts to avoid detection." *Clozza v. Commonwealth*, 228 Va. 124, 134 (1984). Additionally, "evidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference

from which the trier of fact may conclude that the killer acted with premeditation." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1995).

Here, in the light most favorable to the Commonwealth, the evidence was sufficient to prove Cherry guilty of first-degree murder beyond a reasonable doubt. To begin, it was reasonable for the jury to conclude that Cherry stabbed and killed Laura Miles. The Ring doorbell camera showed Cherry alone in the area around the time Laura was talking to her husband. Laura's stab wounds were on her left side, the side that would be exposed while entering the driver's seat of her truck. Cherry's fingerprints appeared on Laura's truck and her phone. And that phone was the same one from which Jack received texts that did not sound like his wife. Cherry also admits to dragging and concealing Laura's body. *See Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992) (explaining that efforts to avoid detection are admissible as evidence of consciousness of guilt, and thus of guilt itself).

Cherry, of course, has a different version of events, one in which an unknown man murdered Laura and he was "merely present at the scene of the murder." But the jury is "entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998).

There was also sufficient circumstantial evidence to prove malice and premeditation. *See Commonwealth v. Hudson*, 265 Va. 505, 512-13 (2003) ("There is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence."). The jury could reasonably infer malice from Cherry's use of a deadly weapon. *See Tizon*, 60 Va. App. at 11. And based on the brutality of the attack, the 11 stab wounds, the lack of provocation, Cherry's concealment of the victim's body, and his efforts to avoid detection (including texting Jack from Laura's phone, attempting to wipe away his fingerprints from the truck, and telling the

police several different stories), the jury could reasonably infer the requisite premeditation. *See Clozza*, 228 Va. at 134; *Morris*, 17 Va. App. at 578.

Lastly, Cherry's arguments about duress and accomplice liability are unavailing. For one thing, duress is generally not available as a defense in first-degree murder cases. *Arnold v. Commonwealth*, 37 Va. App. 781, 788 (2002). Even putting that aside, though, Cherry's assertions that he acted under duress and that he did not aid or abet the attacker assume that the jury accepted his story about the unknown attacker who forced him to help rob Laura and hide her body. But as already noted, the jury was entitled to disbelieve Cherry's testimony and to conclude that he was lying to conceal his guilt. *Marable*, 27 Va. App. at 509-10.

In sum, a rational juror could find beyond a reasonable doubt that Cherry committed first-degree murder. So the trial court properly denied Cherry's motion to set aside the jury's verdict.

C. Concealment of a Dead Body[4]

Cherry next argues that the evidence was insufficient to convict him of concealment of a dead body. He contends that because the Commonwealth presented no evidence about Laura Miles' time of death, it failed to prove beyond a reasonable doubt that the body he concealed was, in fact, dead and not merely unconscious or injured.

Code § 18.2-323.02 makes it a Class 6 felony to transport, secrete, conceal, or alter "a dead body, as defined in § 32.1-249, with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death." Code § 32.1-249, in turn, defines a "dead body" as "a human body or such parts of such human body from the condition of which it reasonably may be concluded that death occurred."

---

[4] Most of Cherry's argument about his conviction for concealment of a dead body is located within his first (waived) assignment of error. *See Barnes*, 80 Va. App. at 595 n.2 (refusing to "consider the arguments Barnes raise[d] under his first assignment of error" because he assigned error to the jury). Still, we assume without deciding that his argument is preserved through his third assignment of error.

- 12 -

Cherry finds some support for his argument in the limited case law interpreting Code §§ 18.2-323.02 and 32.1-249. In *Shaw v. Commonwealth*, 304 Va. 217, 223 (2025), for instance, the defendant "confided in two acquaintances that [the victim's] *dead* body was in his apartment," so it did not matter that the medical examiner was unable to determine the victim's time of death. (Emphasis added).

Cherry's argument could have some force if Code § 32.1-249 defined "dead body" as "a human body in which death has occurred," or "a human body that is no longer living," or something similar. But it does not. It instead defines "dead body" as "a human body or such parts of such human body *from the condition of which it reasonably may be concluded* that death occurred." Code § 32.1-249 (emphasis added). And "when analyzing a statute, we must assume that 'the legislature chose, with care, the words it used . . . and we are bound by those words as we interpret the statute.'" *Doulgerakis v. Commonwealth*, 61 Va. App. 417, 420 (2013) (alteration in original) (quoting *City of Virginia Beach v. ESG Enters.*, 243 Va. 149, 153 (1992)).

Here, Cherry stabbed Laura 11 times and then dragged her body to the ditch by the YMCA. Given the absence of a specific time of death in the record, it is possible she was merely unconscious when he concealed her body. But in the light most favorable to the Commonwealth, based on her unresponsive state and multiple, significant stab wounds, one could reasonably "conclude[] that death occurred." Code § 32.1-249. That is what the statute requires. So the Commonwealth presented sufficient evidence to prove that Cherry concealed a dead body within the meaning of the statute.

D. Robbery and Abduction[5]

"In Virginia, robbery is a common law crime defined as the 'taking, with intent to steal, of the personal property of another, from h[er] person or in h[er] presence, against h[er] will, by violence or intimidation.'" *Jay v. Commonwealth*, 275 Va. 510, 524 (2008) (quoting *Pierce v. Commonwealth*, 205 Va. 528, 532 (1964)). "The degree of asportation of the property need only be slight. The intent to steal means the intent to deprive the owner permanently of h[er] property." *Brown v. Commonwealth*, 24 Va. App. 292, 295 (1997) (citation omitted).

A defendant commits the crime of abduction, meanwhile, if he, "by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of h[er] personal liberty." Code § 18.2-47(A).

"Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case." *Hughes v. Commonwealth*, 18 Va. App. 510, 519 (1994) (en banc). The determination of a defendant's intent is a "factual question" that, as always, "lies peculiarly within the province of the jury." *Id.* (quoting *Ingram v. Commonwealth*, 192 Va. 794, 802 (1951)). It is permissible to infer "that every person intends

---

[5] Cherry's challenges to his convictions for robbery and abduction are arguably waived under Rule 5A:20(e), which requires that an appellant's opening brief contain an "argument (including the principles of law and authorities) relating to each assignment of error." Cherry lists the elements of robbery and abduction but provides no argument about how or why the trial court erred by denying his motion to set aside those convictions. The closest he comes to an argument is at the end of a paragraph about the evidence tying him to Miles' murder, when he asserts that "[t]he Commonwealth presented no credible evidence that the defendant possessed the requisite criminal intent or motive to commit the alleged crimes or committed any act that resulted in the death of the decedent." We assume without deciding that this is enough to comply with Rule 5A:20(e), and we address the robbery and abduction convictions on the merits, as those are the "best and narrowest grounds available." *Commonwealth v. White*, 293 Va. 411, 419 (2017) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)). *But see Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) ("The appellate court is not a depository in which the appellant may dump the burden of argument and research." (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008), *aff'd in part, vacated in part*, 279 Va. 52 (2010))).

the natural and probable consequences of his or her acts." *Walker v. Commonwealth*, 47 Va. App. 114, 121 (2005) (quoting *Schmitt v. Commonwealth*, 262 Va. 127, 145 (2001)).

Here, viewing the evidence in the light most favorable to the Commonwealth, a rational juror could conclude that Cherry robbed Laura of her truck and her phone. Cherry stabbed Laura, drove her truck to the YMCA, and then parked the truck in a nearby apartment complex. His fingerprints were also found on her phone. It does not matter that he only took the phone for a short period of time. *See Brown*, 24 Va. App. at 295 ("The degree of asportation of the property need only be slight."). Nor does it matter that he ultimately abandoned both the truck and the phone. *See id.* (noting that the fact that a stolen wallet contained no money and was thereafter abandoned did not "nullify appellant's intent to deprive [the victim] of his money" when he robbed him). Cherry used violence to take Laura's property from her, and the jury could infer from his actions that he intended to permanently deprive Laura of her property. *See Clay v. Commonwealth*, 30 Va. App. 254, 261 (1999) (en banc) (holding that a fact finder can infer the intent to steal "from the immediate asportation and conversion of the property, in the absence of satisfactory countervailing evidence" from the defendant). The evidence was thus sufficient to find Cherry guilty of robbery.

The evidence was also sufficient to find Cherry guilty of abduction. He attacked Laura in her truck, pushed her from the driver's seat, drove her to the YMCA, and dragged her to a ditch. In other words, he used force to "take" and "transport" Laura. *See Walker*, 47 Va. App. at 121 (holding that defendant used force or intimidation when he "manhandl[ed]" the victim into a truck cab). A reasonable jury could also infer that Cherry intended to deprive Laura of her

personal liberty, as that was a "natural and probable consequence[]" of his actions.[6] *See id.*; *see also Jones v. Commonwealth*, No. 2134-24-2, slip op. at 9, 2026 Va. App. LEXIS 192, at *13 (Mar. 31, 2026) (holding that dragging victim across the floor during an argument was, alone, sufficient to support abduction conviction).[7] Accordingly, the Commonwealth presented sufficient evidence to prove Cherry guilty on all counts, and the trial court did not err in denying Cherry's motion to set aside the verdict.

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*

---

[6] Cherry does not contend that Laura was no longer alive when he abducted her, so we need not decide whether one can, for purposes of the abduction statute, "inten[d] to deprive" a corpse of its "personal liberty." *See* Code § 18.2-47(A).

[7] "Unpublished opinions of this Court, while having no precedential value, are nevertheless persuasive authority." *Otey v. Commonwealth*, 61 Va. App. 346, 351 n.3 (2012).